AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
01/19/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DVE___ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
01/19/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___M.B.___ DEPUTY

United States of America

v.

MIGUEL ALEJANDRO LOPEZ,

Defendant.

Case No. 8:24-mj-00023-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 18, 2024 in the county of Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) | Possession with Intent to Distribute Fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Matthew Klages, DEA, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: January 19, 2024

*Karen E. Scott*
Judge's signature

City and state: Santa Ana, California

Hon. Karen E. Scott, U.S. Magistrate Judge
*Printed name and title*

AUSA: K. Spencer (ext. 3531)

**AFFIDAVIT**

I, Matthew Klages, being duly sworn, declare and state as follows:

## I. **INTRODUCTION**

1. I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been so employed since September 2012. I am currently assigned to the Los Angeles Field Division, Orange County District Office. During my employment with the DEA, I have received specialized drug trafficking investigation training, including on drug interdiction, wiretaps, money laundering, smuggling, financial investigations, controlled substance identification, physical and electronic surveillance, confidential source management, and undercover operations. I have participated in numerous cases involving money laundering, drug trafficking, and the use of wire intercepts, search warrants, surveillance, and interviews of drug traffickers. I am familiar with drug-trafficking methods of operation, including the distribution, storage, and transportation of controlled substances, the collection of proceeds of drug trafficking, and methods of money laundering. I am familiar with street terms involving controlled substances.

## II. **PURPOSE OF AFFIDAVIT**

2. This affidavit is made in support of a criminal complaint against and arrest warrant for Miguel Alejandro LOPEZ ("LOPEZ") for violating Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(vi) (Possession with Intent to Distribute Fentanyl).

1

3. Unless otherwise stated: The facts set forth in this affidavit are based upon my personal observations; my training and experience; oral and written reports about this investigation; and physical surveillance conducted by federal agents or local law enforcement agencies, which has been reported to me either directly or indirectly.  When I assert that a statement was made, I have either heard the statement directly or listened to a recording of the statement, or the statement was reported to me by another law enforcement officer, either directly or in a written report.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and arrest warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  All conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

4. On or about January 18, 2024, the United States Border Patrol conducted a traffic stop of a vehicle in San Clemente, California.  LOPEZ was the driver and the sole occupant of the vehicle.  In the course of the stop, officers searched the vehicle and found approximately 19.48 kilograms of suspected fentanyl concealed in a spare tire in the trunk of the car.  LOPEZ later admitted that he had agreed to transport the tire from the city of Chula Vista, California to the city of Corona, California in exchange for money.

### IV. STATEMENT OF PROBABLE CAUSE

5. Based upon my discussions with other federal and local law enforcement officers, and review of the Border Patrol reports, I know the following:

**A. TRAFFIC STOP OF FORD FUSION IN SAN CLEMENTE, CALIFORNIA**

6. At approximately 2:33 p.m., Border Patrol Agents DeMark and Richardson were driving northbound in a marked vehicle on the Interstate 5 freeway near Basilone Road in San Clemente, California when they saw a gray 2012 Ford Fusion bearing California license plate 9FJE905.

7. The agents observed that although the vehicle was an older model, it appeared to and have a newly-registered license plate.[1] The agents further observed that the vehicle was driving in a manner consistent with an attempt to avoid law enforcement detection. Specifically:

    a. The Fusion was driving approximately 60 miles per hour in the number two lane[2] in an area where most drivers commonly drive 75 to 85 miles per hour. As a result, vehicles were changing lanes to go around the Fusion. Based on their training and experience, agents knew that drug and human

---

[1] Based on their training and experience, the agents knew that California began issuing license plates beginning with the numbers "9F" in 2022. The agents also knew based on their training and experience that individuals involved in drug and human smuggling often use vehicles with newly-registered license plates in order to prevent law enforcement from seeing prior criminal activity associated with the vehicle.

[2] Law enforcement typically number lanes from left to right. For instance, the lane furthest to the left would be the number one lane, the lane second to the left would be the number two lane, and so on.

smugglers often drive at or below the speed limit to avoid being pulled over for speeding.

      b.   When the agents drove their vehicle next to the Fusion, they could see one male occupant who would not look in their direction even though it was obvious the border patrol vehicle was next the Fusion and the agents were looking at the driver. Based on their training and experience, the agents knew that drivers typically will look to the left or right to acknowledge law enforcement vehicles driving near them.

      c.   When the agents slowed their speed and changed lanes to drive behind the Fusion, they noticed that the driver of the fusion appeared to be having a difficult time maintaining the lane and that the vehicle was drifting into the lanes to the left and right of the vehicle. Based on their training and experience, the agents knew that this type of driving is commonly indicates that the driver is distracted in some way, such as paying more attention to the side mirrors instead of the road ahead of them.

8.   Agents also conducted a California DMV records check of the vehicle and determined that it was registered to LOPEZ at a Post Office ("PO") Box on Camino De La Plaza in San Ysidro, California. Based on their training and experience, the agents were aware that drug smugglers will often register vehicles used for drug or human smuggling at PO Box locations in order to avoid the vehicles being associated with their home addresses. The agents were further aware that this specific PO Box location

is often used by the people involved in drug and human smuggling because of its proximity to the US-Mexico border.

9. The agents also performed a Department of Homeland Security ("DHS") records check of the vehicle and saw that the vehicle had crossed from Mexico to the United States twice in two days.

   a. First, the vehicle crossed through the San Ysidro Port of Entry on January 17, 2024 at approximately 2:57 PM and delayed its travel north approximately six hours before making a trip north and back south on Interstate 15 which totaled three hours late in the evening. Based on the agents training and experience, type of quick turnaround is a common tactic used by smugglers when they are dropping off people or contraband to taking proceeds back south.

   b. Second, the vehicle had crossed into the United States via the San Ysidro Port of Entry at approximately 6:16 a.m., approximately eight hours before the traffic stop described herein. Agents determined that when the vehicle crossed, it was occupied by LOPEZ. A records check of LOPEZ revealed that he had previously been arrested for alien smuggling in 2022. A records check of LOPEZ also showed that he had also been denied SENTRI[3] clearance.

---

[3] The Secure Electronic Network for Travelers Rapid Inspection (SENTRI) is a U.S. Customs and Border Protection (CBP) program that allows expedited clearance for pre-approved, low-risk travelers upon arrival in the United States. Participants may enter the United States by using dedicated primary lanes into the United States at Southern land border ports. Travelers must be pre-approved for the SENTRI program. All applicants undergo a rigorous background check and in-person interview before enrollment.

5

10. The agents determined that the Fusion had previously been associated with California License Plate number 6UQM337. Agents conducted a DMV records check of that plate number and determined that there was an associated release of liability to Ochoa Automotriz in Tijuana, Mexico on March 30, 2023. The vehicle was then transferred to Backlot Cars in Escondido, California on April 4, 2023, then to Aillian Auto Sales in San Diego, California on April 05, 2023. Based on their training and experience, the agents knew that vehicles sold to auto businesses in Mexico from the United States often have non-factory compartments installed that can be used for contraband smuggling. The records check showed that the vehicle was purchased and transferred to LOPEZ on May 10, 2023, and crossed the into the United States from Mexico through the San Ysidro Port of Entry that same day.

11. Based on all of the above, the agents believed that LOPEZ was driving the Fusion and that he might be involved in drug or human smuggling. Accordingly, the agents initiated a traffic stop of the Fusion.

B. **SEARCH OF VEHICLE**

12. After initiating the traffic stop, agents approached the vehicle and contacted LOPEZ, who was identified by photo identification. LOPEZ told the agents that he was traveling to Corona, California to pick up his friend. The agents asked LOPEZ what was in the trunk of the vehicle. LOPEZ stated that there was a spare tire and a jacket. The agents also asked LOPEZ about his prior arrest history, and LOPEZ stated that he

had been previously arrested for smuggling people in the trunk of a vehicle.

13. Agents asked LOPEZ if he would open the trunk of the vehicle to confirm that there were no individuals concealed in the trunk, and LOPEZ responded, "Absolutely." After LOPEZ opened the trunk, officers saw that it contained a large spare tire that was oversized for the vehicle. Based on their training and experience, the agents knew that it is common for drug smugglers to conceal and transport drugs inside of tires or other objects in the trunk of a vehicle.

14. LOPEZ eventually stated that the spare tire had not been in the trunk of the vehicle when he crossed from Mexico into the United States, but that he had met up with someone in the Otay Ranch area of Chula Vista, California, and that that person had placed the tire in the trunk.

15. At that point, agents requested the assistance of Border Patrol Agent Gomes and his canine partner "Mya." When he arrived, Agent Gomes asked LOPEZ who owned the vehicle. LOPEZ stated that the vehicle was his. Agent Gomes asked for permission to perform a canine search of the vehicle. LOPEZ verbally agreed. Agent Gomes proceeded to direct Mya search the vehicle, and Mya alerted to the trunk of the vehicle.

16. Following the canine alert, agents proceeded to search the trunk of the vehicle. They removed the spare tire and found that it contained, in total, 15 packages containing numerous blue pills labeled "M-30". Based on their training and experience, agents knew that the appearance of the pills was

7

consistent with counterfeit oxycodone pills containing fentanyl. LOPEZ was arrested and transported to the San Clemente Border Patrol checkpoint without incident.

### C. DEA INTERVIEW OF LOPEZ

17. After LOPEZ was transported to the checkpoint, DEA Task Force Officers (TFO) Galvan and Titus interviewed LOPEZ. TFO Galvan read LOPEZ his Miranda rights. LOPEZ indicated that he understood his rights and agreed to speak with the officers. LOPEZ also gave the officers oral and written consent to search his cellular phone.

18. During the interview, LOPEZ stated the following:

    a. LOPEZ resides in San Ysidro with his parents and also stays in Tijuana, Mexico. A friend of a friend (who LOPEZ later identified as Federico CASTILLO) asked LOPEZ if he would like to make some money on the side by picking up a tire and transport it to the city of Corona. LOPEZ agreed to do the job because he had lost his job and needed money. Earlier that day, LOPEZ received a WhatsApp message from CASTILLO regarding the job.[4]

    b. At approximately 1:00 P.M., LOPEZ was directed by CASTILLO to pick up the tire at an apartment complex located in the Otay Ranch area of Chula Vista, California. When LOPEZ arrived, a blue Cadillac SUV with dealer paper plates pulled up next LOPEZ. The Cadillac SUV was occupied by two unidentified Hispanic males: one in the driver seat ("UHM-1") and one in the

---

[4] LOPEZ said CASTILLO will only communicate with LOPEZ using WhatsApp.

8

passenger seat ("UHM-2"). UHM-2 exited the Cadillac, walked to the rear of the Cadillac and grabbed a tire from the Cadillac. LOPEZ then popped the trunk and UHM-2 placed the tire into LOPEZ's trunk. UHM-2 then closed LOPEZ's trunk and tapped twice on trunk, informing LOPEZ he was good to drive away. LOPEZ did not know what was inside the tire.

      c.  LOPEZ was planning on using Interstate 15 to deliver the tire in Corona, California, but CASTILLO directed LOPEZ to take Interstate 5 due to heavy traffic. LOPEZ was later stopped by Border Patrol agents in San Clemente. LOPEZ knew CASTILLO from high school, but CASTILLO now lives in Tijuana. LOPEZ believes that CASTILLO is a broker for a Mexico Drug Trafficking Organization.

    19.  DEA agents weighed the fifteen packages of suspected fentanyl pills and determined that they weighed approximately 19.48 kilograms. An initial field test of the suspected fentanyl pills was inconclusive. A subsequent test of the suspected fentanyl pills was positive for fentanyl.

## CONCLUSION

    20.  For all the reasons described above, there is probable cause to believe LOPEZ violated Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(vi) (Possession with Intent to Distribute Fentanyl).

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 19th day of January 2024.

_____
UNITED STATES MAGISTRATE JUDGE
    KAREN E. SCOTT